UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————— )
SAMANTHA BYRNE,                           )
      Plaintiff,                             )
                                           )
v.                                                      )        Docket No.
                                           )
COMMURE, INC.                             )
          Defendant.                        )
———————————————————————— )

## COMPLAINT & JURY DEMAND

### INTRODUCTION

1.      Plaintiff Samantha Byrne ("Plaintiff" or "Ms. Byrne") was an employee of Defendant Commure, Inc. ("Commure") from May 2021 until her termination in November 2023 while she was on protected parental leave under the Massachusetts Paid Family and Medical Leave Act. Commure's termination of Ms. Byrne's employment was the culmination of ongoing discrimination and retaliation that Ms. Byrne faced because of her sex, her pregnancy, her decision to take paid family and medical leave for the birth of her child, and the concerns she raised about the discrimination she was facing.

2.      Until Ms. Byrne requested parental leave and raised concerns about discrimination, Ms. Byrne was universally celebrated at Commure for her strong commitment to the company and her outstanding performance. Indeed, as recently as late March 2023, Ms. Byrne was recognized in her performance review as "all that is good and right in a Commurian," and she was promoted to a Senior Director position in April 2023.

3.      After Ms. Byrne became pregnant and following her request for parental leave, Commure told her it was withholding pay associated with her promotion because of her upcoming parental

leave. After she raised concerns that this constituted discrimination, Commure retaliated against Ms. Byrne by, among other things, unfairly and publicly criticizing her performance, drastically reducing her duties, and, ultimately, terminating her employment while she was on parental leave under the Massachusetts Paid Family and Medical Leave Act.

4.      The reasons Commure gave for terminating Ms. Byrne were false and pretextual or were, themselves, unlawful. In an email to Ms. Byrne about her termination, Commure explained that she was let go because her role was "determined to be redundant" or because her "services were no longer needed" following Commure's merger with another company. In fact, Ms. Byrne's position as the leader of Corporate Marketing remained critical to the company. Ms. Byrne learned after the merger that Marketing's most important and first order of business, according to the COO, was to rebrand the Commure website and reevaluate Commure's product naming architecture. Ms. Byrne was the only member of the Marketing team – either current or former – who had the experience and expertise to do both. Furthermore, Ms. Byrne's role was not redundant, as the company Commure merged with did not have its own marketing team. On information and belief, Commure's outgoing CEO at the time, Dr. Ashwini Zenooz, stated in or around February 2024 that her "hands were tied" and that she had no choice but to terminate Ms. Byrne's employment in order to "protect the company."

5.      By terminating Ms. Byrne as and when it did, Commure unlawfully interfered with her exercise of, and retaliated against her for exercising, her rights under state and federal law to take legally-protected leave for the birth of her child.

6.      Commure's conduct violates Massachusetts anti-discrimination and anti-retaliation law as well as the Massachusetts Paid Family Medical Leave Act, G.L. c. 175M, which requires companies to restore Massachusetts employees who have taken protected leave for the birth of a

child to their positions or equivalent positions following the end of their leaves. Ms. Byrne has suffered significant damages as a result of Commure's unlawful conduct including, but not limited to, lost salary, bonus, equity, and benefits, lost career opportunities, reputational harm, and emotional distress.

## PARTIES

7.      Plaintiff resides in Middlesex County, Massachusetts. She was an employee of Commure, Inc., and worked remotely for Commure from her home in Middlesex County, Massachusetts.

8.      Defendant Commure, Inc. is a company that is incorporated in Delaware and whose principal place of business is in San Francisco, California.  At all relevant times, Commure was Plaintiff's employer.

## JURISDICTION & VENUE

9.      This action arises out of Commure's violations of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, and the Massachusetts Paid Family and Medical Leave Act, G.L c. 175, § 9.

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332.

11.     All conditions precedent to jurisdiction have been met.

12.     Venue is proper in this district under 29 U.S.C. § 1391(b)(2) because Commure's unlawful acts occurred in Middlesex County, Massachusetts.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.     On August 3, 2023, Ms. Byrne filed a complaint with the Massachusetts Commission Against Discrimination (MCAD).

14.     Ms. Byrne filed a Motion to Amend her MCAD Complaint on December 26, 2023.

15.     The MCAD allowed Ms. Byrne's Motion to Amend on March 15, 2024.

3

16.     Ms. Byrne withdrew her MCAD Complaint on April 1, 2024.

17.     All conditions precedent to the institution of this action have been fulfilled.

## STATEMENT OF FACTS

### *Background*

18.     Commure is a start-up company backed by General Catalyst that creates software for healthcare providers.  Commure recently merged with Athelas, another healthcare start-up backed by General Catalyst.  After the merger, Commure announced a combined valuation of six billion dollars, and the CEO stated that the company is "on track to go public" in the next 2-3 years.

19.     Commure boasts that it is "driven by a deep belief that we should all have respect for everyone," with a "culture of performance" that "invites everyone to do their best work and recognizes those who go above and beyond in pursuit of our collective mission."  According to its handbook, Commure has a zero-tolerance policy against discrimination and harassment. Commure also claims to offer "unlimited paid time off for employees to use however they want."

### *Byrne's Outstanding Performance at Commure Was Universally Recognized*

20.     Ms. Byrne graduated *summa cum laude* with a master's degree in Communications and a concentration in Advertising from Syracuse University's Newhouse School of Communications, one of the top ten communications programs in the country.

21.     After working in communications and marketing for several years, Ms. Byrne was personally recruited to work at Commure in March 2021 by then-CEO Ashwini Zenooz, MD, who described Ms. Byrne in multiple emails (including to other Commure executives) as "amazing" and "brilliant."  In the months after Ms. Byrne joined the company, Hemant Taneja

(CEO and managing director at General Catalyst) wrote to Dr. Zenooz that Ms. Byrne was a "good hire" and praised Dr. Zenooz for bringing Ms. Byrne on board.

22.    Ms. Byrne became an employee of Commure in May 2021. Her title was initially Creative Director, Content Marketing. After three months in the position, her title was changed to Director, Corporate Marketing.

23.    In April 2023, Ms. Byrne was promoted to a Senior Director position with the title Creative Director, Corporate Marketing.

24.    On March 25, 2023, shortly before her promotion, Ms. Byrne received her Q1FY24 Performance Review.  In her review, Ms. Byrne's manager, then-Vice President and Head of Marketing Katie Marquis, gave Ms. Byrne the highest overall rating possible of "5: Truly exceeds expectations." Ms. Marquis wrote in the review, among other things, that "[Ms. Byrne] is an incredible talent with the most exceptional and unmatched capacity to translate value and position it into written, visual or verbal messages. [Ms. Byrne] is an expert in her craft and remains a steadfast champion of practicing at the top of her license. [Ms. Byrne] is also an outstanding teammate. The entire marketing team solicits her help, and she is highly collaborative; we all depend on her . . . [Ms. Byrne] is an example of all that is good and right in a Commurian."

*Ms. Byrne Faced Discrimination and Retaliation on the Basis of Sex and Pregnancy and for Planning to Take Paid Family and Medical Leave, and She Reported this Discrimination and Retaliation to HR*

25.    In February 2023, Ms. Byrne notified Ms. Marquis that she was pregnant and that she planned to take 16 weeks of leave pursuant to Commure's Parental Leave Policy and Massachusetts law.

26.     During a meeting on April 18, 2023, Ms. Marquis notified Ms. Byrne that Ms. Byrne was being promoted from Director to Senior Director, with the new title of Creative Director, Corporate Marketing, which included a 3% raise.

27.     Ms. Byrne responded that while she was grateful for the promotion, a raise of 3% felt proportionally low for a full promotion, and she asked for the rationale. (For context, Ms. Byrne had just notified one of her direct reports, a newly promoted Director, that she would receive a 5.5% promotional raise.)

28.     Ms. Marquis responded that Ms. Byrne's total promotional package would actually be larger, because she would also receive a $20,000 bonus.  Ms. Marquis added, however, that the bonus would be paid eleven months later, in March 2024, not at the time of the promotion, and that it might be contingent upon the length of Ms. Byrne's parental leave – particularly if Ms. Byrne's leave exceeded a certain length of time.

29.     Surprised that a bonus earned as part of a promotion might be withheld based on the length of her upcoming parental leave, Ms. Byrne asked to be paid at the time of her promotion instead, not eleven months later.

30.     Ms. Marquis responded that the "optics wouldn't look good" to ask for the money at the time of promotion, because Ms. Byrne could take the raise and not return after leave.  Ms. Marquis then asked Ms. Byrne if she was planning to return to Commure after her leave. Ms. Byrne responded that she had every intention of returning, but that she did not believe it was appropriate to withhold money associated with a current promotion until her return from leave.

31.     Ms. Byrne offered to reach out to Human Resources directly to advocate for her full raise at the time of promotion, but Ms. Marquis said she would contact HR herself, and ended the call.

32.     Towards the end of that day, still uncomfortable about what had transpired, Ms. Byrne reached out to a Human Resources representative at Commure, Senior People Partner Tori McDonald. Ms. Byrne shared her concern that she had been discriminated against and she asked for guidance. Ms. McDonald responded that she wasn't familiar with the specifics of Ms. Byrne's promotional package, but she would meet with Ms. Marquis to find out more.

33.     Although announcements of promotions were common at Commure, Ms. Byrne's promotion was never publicly announced within the company. In fact, Ms. Marquis did announce the promotion of the one other Marketing employee who had been promoted during the same cycle as Ms. Byrne, but Ms. Marquis made no mention of Ms. Byrne's promotion.

*Immediately After Ms. Byrne Reported Discrimination to Human Resources,*
*She Was Retaliated Against*

34.     On April 19, the day after Ms. Byrne first complained of discrimination, Ms. Byrne joined a Marketing Leadership meeting led by Ms. Marquis. This was the first time Ms. Byrne interacted with Ms. Marquis after Ms. Byrne reported her discrimination concerns to HR.

35.     To start the meeting, Ms. Marquis asked for feedback on the Marketing Leadership team's "Smartsheet" work management software. Ms. Byrne offered to jump in first. She provided positive feedback and also identified potential areas for improvement.

36.     Ms. Marquis dismissed Ms. Byrne's suggestions and explained that Ms. Byrne needed to use the system's current functionality as is. This reaction was surprising to Ms. Byrne, as Ms. Byrne had provided her thoughts in response to Ms. Marquis' request for feedback on the software.

37.     Ms. Byrne then pulled up a makeshift project tracker that she had previously created for herself and her team (as a work-around for Smartsheet) to show where she already started exploring more effective methods, and then proposed a few more suggestions for improvement.

38.    Ms. Marquis' tone then became angry. She criticized Ms. Byrne's leadership and accused Ms. Byrne of setting a bad example for her team. This was the first time Ms. Marquis had ever criticized Ms. Byrne's leadership abilities.

39.    Not only did this reaction contradict Ms. Marquis' unequivocal praise of Ms. Byrne's work and leadership style from the day before, but it directly contradicted an email Ms. Marquis sent to the Marketing team on March 31, 2023 (before Ms. Byrne reported discrimination) specifically praising Ms. Byrne's creation of the work-around project tracker.

40.    Indeed, in her email on March 31, Ms. Marquis wrote that Ms. Byrne's team's "commitment to excellence is truly remarkable" and stated that the very tracker she was now criticizing "blew our minds." She added – in reference to Ms. Byrne's tracker – that Ms. Byrne demonstrated "an unwavering commitment to delivering what we've asked of you."

41.    As the April 19th meeting progressed, Ms. Marquis continued to publicly criticize Ms. Byrne, chastising Ms. Byrne for her use of the Smartsheet tool and continuing to criticize the example she was setting for her team members.

42.    At this point, a colleague jumped in and redirected the conversation by noting the challenges he had encountered using Smartsheet. In contrast to how she responded to Ms. Byrne's feedback, Ms. Marquis did not dismiss his feedback or otherwise criticize him after he provided his critique of Smartsheet.

43.    Following the meeting, Ms. Byrne reached out to this colleague via Slack and said, "That was a good comment." The colleague responded, "woof- sorry you were getting ganged up on."

*Ms. Byrne Made Multiple Efforts to Work with Human Resources to Address Her Concerns*

44.　　The same day, soon after the Marketing Leadership meeting ended, Ms. McDonald reached out to Ms. Byrne. Ms. McDonald told Ms. Byrne that her bonus would not be "pro-rated" due to her parental leave. She also said she had spoken with Ms. Marquis and, according to Ms. Marquis' account of the promotion conversation, the only mention Ms. Marquis made of Ms. Byrne's parental leave was a suggestion that Ms. Byrne could check with HR to see if her bonus would be pro-rated in connection with her leave.

45.　　Concerned that Ms. Marquis had not relayed the conversation accurately to Ms. McDonald and that she had specifically omitted any mention of her discriminatory comments, Ms. Byrne responded to Ms. McDonald, writing, "Okay, that's not all [Ms. Marquis] said," and added, "I just find it so unfathomable that my pregnancy would have been brought up twice within the context of my promotion and receiving a lower raise. I'm really struggling with this, it's been a tough day."

46.　　Also concerned that Ms. McDonald was not addressing the problem and that she was being retaliated against by Ms. Marquis, Ms. Byrne reached out to a more senior member of Human Resources, Vice President of People Heather Henry, and met with Ms. Henry later in the day on April 19.

47.　　During their meeting, Ms. Byrne recounted what happened during the original call with Ms. Marquis on April 18. Ms. Henry responded that she was aware that Ms. Byrne had asked Ms. Marquis for more money for the promotion, but that she was not aware that the topic of her parental leave was part of the conversation. Ms. Byrne explained that she had not asked for more money – she had simply asked that her promotion bonus be paid at the time of her promotion, not contingent on her return from parental leave or on the length of her

parental leave.

48.     Ms. Byrne also shared that Ms. Marquis had asked Ms. Byrne directly if she planned to return to work after her leave, and that Ms. Marquis had told her that the "optics" of asking for her full raise before leave would not be good. Ms. Byrne reiterated that this was highly unethical and upsetting to her.

49.     Ms. Byrne then disclosed to Ms. Henry that Ms. Marquis had been hostile in the Marketing Leads meeting and that she was worried that Ms. Marquis would continue to single her out and lash out at her in future meetings. She also shared her colleague's feedback that Ms. Byrne had been "ganged up" on.

50.     Ms. Henry responded, "that sounds like retaliation" – and then requested that Ms. Byrne take the following day off.

51.     Ms. Byrne and Ms. Henry met again five days later on Monday, April 24. Ms. Henry shared that, typically, HR engages a third-party firm to investigate internal complaints, but that the third-party firm they use was "at capacity" and could not conduct a review of Ms. Byrne's retaliation concerns.

52.     Ms. Henry further explained that, in lieu of a full third-party investigation, Ms. McDonald had already spoken with two witnesses to the April 19 Marketing Leadership meeting the previous Friday afternoon, and she "didn't find anything," so HR would not proceed with further action, and Ms. Byrne needed to return to work.

53.     Ms. Byrne responded that she did not think the investigation Commure had conducted hastily in one afternoon was sufficient.

54.     In fact, the company failed to conduct an investigation in compliance with its own policy, which states: "Any reported incident will be investigated by qualified personnel in a

fair, impartial, timely, and thorough manner that provides all relevant parties with the opportunity to be heard and to present any information he or she thinks is relevant or important for consideration, and that allows Commure to reach reasonable conclusions based on the information collected."

55.     Indeed, Ms. Byrne was not interviewed or given an opportunity to present relevant information in connection with the investigation.  She did not even know that an investigation was underway until three days after Commure declared the investigation over.

56.     During their conversation on April 24, Ms. Byrne asked Ms. Henry for further guidance on how to move forward in light of her ongoing discomfort with the treatment she had faced.

57.     Ms. Henry responded by offering three options: Ms. Byrne could file a formal complaint with HR that would require the company to find an available third-party firm to fully investigate; Ms. Byrne could engage an employment lawyer to help "arbitrate" between herself and the company; or Ms. Byrne could engage an employment lawyer to file a lawsuit and proceed with litigation.

58.     On Tuesday, April 25, Ms. Byrne and Ms. Henry met again. Ms. Henry shared that she had spoken the previous day with members of Commure's C-suite to discuss Ms. Byrne's situation. In reference to the 3% salary increase offered to her in connection with the promotion on April 18, Ms. Henry stated that Ms. Byrne "had a valid point that the $6,000 was not representative of what [Ms. Byrne] had earned for the promotion," and she hoped they could reach an agreement during their meeting. She added that she had specifically talked with the Chief Growth Officer and Chief Financial Officer about making Ms. Byrne a deal.

59.     Ms. Henry also stated that Commure's leadership team had not engaged lawyers yet

and were waiting to see if Ms. Byrne did first, then offered Ms. Byrne four options: (1) if Ms. Byrne felt she could no longer work for the company, she could take unpaid leave but keep her benefits until her parental leave or until she found another job; (2) Ms. Henry could offer Ms. Byrne an additional $10,000 to her base salary; (3) Ms. Henry could help set parameters so that Ms. Byrne would be comfortable in the workplace, including a better work-life balance, or anything else that might help; or (4) Ms. Byrne could leave Commure and negotiate for severance and COBRA.

60.     With respect to Ms. Henry's offer to help Ms. Byrne set parameters, Ms. Henry only offered to support Ms. Byrne through "the next five months" until her parental leave, not her time at Commure beyond parental leave, and she repeatedly mentioned that Ms. Byrne just needed to "get to [her] leave." Ms. Byrne found this alarming particularly because she had already expressed her interest in continuing her employment at Commure beyond her leave.

61.     The following day, on April 26, Ms. Byrne emailed Ms. Henry and indicated that she wished to remain at Commure. She attached a proposal outlining her thoughts about how to make her return to work successful following these incidents, which included holding monthly check-ins with Ms. Henry until her maternity leave. In this proposal, Ms. Byrne also indicated that she would like to accept Ms. Henry's offer for a $10,000 base pay increase and a title change from Creative Director to Senior Director to accurately reflect her recent promotion.

62.     Ms. Henry called Ms. Byrne later that day and indicated that the pay and title adjustments would not be a problem, and that things were "looking good" according to the leadership team.  Just 6 days later, however, Ms. Henry rescinded this agreed upon deal at the instruction of Dr. Zenooz.

63.     On Thursday, April 27, Ms. Byrne met by video with Ms. Henry and Ms. Marquis.

12

Despite her earlier promises to support Ms. Byrne until her parental leave, Ms. Henry now declined all of the suggestions in Ms. Byrne's proposal, including holding monthly check-ins with Ms. Byrne, and she later denied any knowledge of the discrimination and retaliation Ms. Byrne had reported to HR.

64.    Ms. Byrne shared during the meeting that she had been witness to several "hostile and unethical" situations over her two years with the company, including – most significantly – at the hands of Dr. Zenooz. In response to Ms. Byrne's reports of hostility and unethical conduct among the most senior leaders at the company, Ms. Henry dismissed Ms. Byrne's complaints as "a lot of drama" and ended the call. Ms. Henry never followed up to learn more about Ms. Byrne's serious concerns, even though Commure's own policies require that all claims reported to People Ops (the department that Ms. Henry led) "will be treated seriously and investigated."

*Commure Failed to Address Ms. Byrne's Ongoing Concerns; Instead, Ms. Byrne Faced Ongoing and Increasingly Severe Retaliation*

65.    Commure's own policies state that, when discrimination and retaliation complaints are made, "Appropriate action will be taken by the Company to stop and remedy any and all such conduct, including interim measures during a period of investigation. The investigation will be completed in a timely manner, after which Commure will inform the complaining party of the conclusions reached concerning the complaint."

66.    Despite Ms. Byrne's ongoing complaints about the discrimination and retaliation she was facing, Commure failed to conduct any investigation beyond Ms. McDonald's cursory April investigation until Commure hired an outside investigator to conduct an investigation into Ms. Byrne's complaints in late June 2023, two months after Ms. Byrne initially raised her concerns.

67.    Contrary to Commure's policy, Commure never informed Ms. Byrne of the conclusions

13

reached regarding her complaints in either the initial cursory investigation or the later, more formal, investigation.

68.     Indeed, rather than investigate and address Ms. Byrne's complaints in a timely manner in accordance with its own policy, Commure continued to discriminate and retaliate against her until her termination.

69.     For example, on Tuesday, May 2, Ms. Byrne met again with Ms. Henry. During the meeting, Ms. Henry shared that, after meeting Dr. Zenooz, the company had decided not to move forward with the salary increase or title change that had previously been offered.

70.     Ms. Henry stated that Ms. Byrne would not be given a title change because leadership considered her promotion to be a "micro-promotion" that was not based on performance or scope but was mostly based on her two-year tenure at the company.

71.     In other words, all of a sudden, following her protected activity, even Ms. Byrne's hard-earned promotion was under attack.

72.     In the May 2 meeting, Ms. Henry said she would add an additional $5,000 to Ms. Byrne's base salary, but that Dr. Zenooz would not honor the full $10,000 because the company "can't make adjustments every time someone complains," and that "wouldn't be fair" to the rest of the employee base.

73.     Confused by this comment, Ms. Byrne reminded Ms. Henry that Commure had offered $10,000 to Ms. Byrne, and that Ms. Byrne's understanding was that the adjustment was intended to correct for what Ms. Henry had agreed was not representative of what Ms. Byrne had earned.

74.     In fact, Commure did not even honor its second (reduced) offer, ultimately raising Ms. Byrne's salary by only $4,000.

75.     During this May 2 meeting, Ms. Henry suggested that Ms. Byrne's increased base salary

would put her in a better position to negotiate for future job opportunities outside of Commure. This again alarmed Ms. Byrne because she had never expressed a desire or intent to leave the company.

76. Ms. Henry also shared her concern that Ms. Byrne "would not be able to bounce back" and that she would "always hold old resentment" moving forward.

77. A little over a week later, on May 11, Ms. Byrne met again with Ms. Henry. During this meeting, Ms. Henry notified Ms. Byrne that Dr. Zenooz had removed Ms. Byrne from core Communications projects. Ms. Byrne expressed concern about her job security – she feared that Dr. Zenooz would push her out of the company just before her parental leave and claim that it was due to this reduction in scope.

78. Ms. Henry falsely assured Ms. Byrne that her fear of being pushed out of the company would not happen because she not only had a protected status, but she was also high performing.

79. Ms. Henry also shared information Ms. Byrne had previously been unaware of – that a former employee of Commure, whom Ms. Henry identified by name, had negotiated a separation before taking her own parental leave. Ms. Henry suggested that Ms. Byrne could do the same, and asked Ms. Byrne not to tell anyone that she had shared this information.

80. Ms. Henry's discussion of this other employee's departure struck Ms. Byrne as odd, as it was the second time in less than two weeks that Ms. Henry was suggesting that Ms. Byrne might leave the company, and Ms. Byrne had been clear that she wished to remain. Ms. Byrne was also deeply uncomfortable that Ms. Henry was sharing highly confidential information about the circumstances surrounding another pregnant employee's departure.

81. After Ms. Henry notified Ms. Byrne that Dr. Zenooz was removing her from Dr.

Zenooz's projects, Ms. Byrne's project workload dropped from more than 130 projects to just 32 within a month. This represented a 75% reduction in Ms. Byrne's workload. Ms. Byrne's workload continued to be significantly reduced without justification for the rest of her time at Commure.

82.     Ms. Byrne's direct reports reported to her their serious concerns that the quality of their work decreased because she was not involved in their projects.

83.     Following Ms. Byrne's complaints and efforts to address the discrimination and retaliation she was facing, Ms. Byrne faced continued retaliation.

84.     For example, in June 2023, Commure falsely accused Ms. Byrne of engaging in illegal conduct, accusing her of secretly recording her April 19 meeting with Ms. Marquis, which Ms. Byrne had already explained had not occurred.

85.     Commure also falsely alleged that Ms. Byrne had admitted to unlawfully recording her former boss earlier in her career, a claim Commure knew was without merit.

86.     This allegation was particularly shocking to Ms. Byrne because Commure's then-CEO, Dr. Zenooz, knew that Ms. Byrne had been a witness to Dr. Zenooz engaging in just this type of conduct.

87.     Ms. Byrne formally reported the baseless allegation as an example of retaliation to Ms. Henry, writing, "I have serious concerns that I am being targeted by Commure's most senior leaders and consequently subjected to severe and escalating retaliatory actions, none of which ever happened until after I engaged in protected activity." Despite Ms. Byrne's formal complaint of retaliation, Ms. Henry responded, "We are not aware of any unlawful or retaliatory conduct."

88.     Some additional examples of the ongoing retaliation Ms. Byrne faced include, but are not limited to, ongoing exclusion from projects central to her position; repeated unfounded

criticism of Ms. Byrne's work; failure to give Ms. Byrne and her team credit for their strong performance; denial of Ms. Byrne's record-setting work; unfair disqualification from a review cycle and compensation eligibility; false accusations that Ms. Byrne had violated the company's Corporate Handbook; and false accusations that Ms. Byrne and her team had violated PTO policy.

*Ongoing Discrimination and Retaliation Following the Filing of Ms. Byrne's MCAD Complaint*

89.    On August 3, 2023, Ms. Byrne filed a Complaint with the MCAD.

90.    In the months after Ms. Byrne filed her MCAD complaint, she was excluded from, and kept in the dark on, many key projects in the department she still led.

91.    On information and belief, Ms. Byrne's direct reports were instructed on numerous occasions not to inform Ms. Byrne of the projects they were working on.

92.    When one direct report asked Ms. Marquis and Dr. Zenooz during a meeting why Ms. Byrne was no longer involved in their department's projects, Ms. Marquis answered that it was because of Ms. Byrne's upcoming parental leave.

93.    As noted above, Ms. Byrne's direct reports also reported to her their concerns that the quality of their work was diminished because she was not involved.

94.    After Ms. Byrne filed her MCAD complaint, Commure also unfairly disqualified her from continued career and compensation advancements by failing to give her a mid-year performance review, a prerequisite to receiving a mid-year merit increase or title change, among other things.

*The Termination of Ms. Byrne's Employment and Commure's Pattern of Pregnancy Discrimination, Sex Discrimination, and Retaliation*

95.    Ms. Byrne began her parental leave in September 2023.

96.    On November 9, 2023, while she was still on parental leave under the Massachusetts

17

Paid Family and Medical Leave Act, Ms. Byrne was notified that her employment at Commure was being terminated effective November 15, 2023 as part of a larger layoff at the company.

97.     In an email to Ms. Byrne about her termination, Commure's new CEO, Tanay Tandon, explained that she was let go because her role was "determined to be redundant" or because her "services were no longer needed."

98.     In fact, Ms. Byrne's position as the leader of Corporate Marketing remained critical to the company, with her services still very much needed.

99.     Ms. Byrne learned after the merger that Marketing's most important and first order of business, according to the COO, was to rebrand the Commure website and reevaluate Commure's product naming architecture. Ms. Byrne was the only member of the Marketing team – either current or former – who had the experience or expertise to do both.

100.    Furthermore, Ms. Byrne's role was not redundant, as Commure had just merged with another company that did not have its own Marketing team.

101.    Ms. Byrne's termination was the culmination of a months-long effort to strip Ms. Byrne of her duties at the company that began immediately after she complained of discrimination and retaliation.

102.    Indeed, on information and belief, in or around February 2024, Dr. Zenooz confided in another Commure employee that "her hands were tied," and she had no choice but to terminate Ms. Byrne's employment in order to "protect the company."

103.    The termination of Ms. Byrne's employment is part of a larger pattern of pregnancy and sex discrimination at Commure, and discrimination and retaliation against employees who take protected medical leave or otherwise engage in protected activity.

104.    On information and belief, when Commure terminated Ms. Byrne's employment, it also

terminated the employment of every woman at Commure who had disclosed that they were pregnant (including at least two women who were 8+ months pregnant), at least one other woman on parental leave, and a female Vice President who had recently returned from parental leave.

105. In total, five members of the Marketing team were terminated as part of the layoff.

106. Four of the five employees who were laid off were pregnant and/or already a mother, including Ms. Byrne.

107. After the layoff, the only members of Commure's Marketing team who remained employed were neither pregnant nor parents.

108. One of the Marketing team members who was laid off, the Head of Marketing, was pregnant at the time of the layoff.

109. Following the layoff, Commure gave the Head of Marketing position to a woman who has publicly discussed planning never to have children herself and who was less qualified for the position than her pregnant predecessor.

110. After Ms. Byrne's termination, another impacted employee (who was pregnant at the time of her termination) sent Ms. Byrne a message on LinkedIn expressing that Commure had made it "impossible" for her to find new employment given that she was terminated during the third trimester of pregnancy, and adding, "It was hard to also see so many pregnant people being let go. Still doesn't feel right."

111. Less than a week after terminating Ms. Byrne and other mothers and/or pregnant women on the Marketing team, Commure was already hiring to back-fill their roles, despite previously citing redundancies or services no longer needed as reasons for the layoffs.

112. For example, on November 21 (just 6 days after the terminated employees' final day

of employment), Commure advertised for a Growth Marketing Manager. This was the same role held by one of the mothers that Commure fired from the Marketing team who had recently been approved for medical leave, even though the now-terminated employee who previously held the role was high performing and had been promoted to team lead as recently as April 2023.

113. Commure has also posted for a position entitled "Product Manager, Strongline." This is a position that was held by a high-performing female employee who was also laid off in November 2023 when she was 8 months pregnant.

114. Prior to the layoffs, in early 2023, Dr. Zenooz put pressure on Ms. Byrne to come up with a plan to terminate one of her direct reports who was on medical leave – specifically because the employee had taken medical leave – after her return to work. Despite Dr. Zenooz's pressure, Ms. Byrne did not believe termination was appropriate and she declined to carry out the termination plan. Instead, the employee returned from leave and continued her strong performance at the company.

115. Also prior to the layoffs, in early 2023, one of Ms. Byrne's colleagues shared with Ms. Byrne that she was pregnant but added that she was "keeping it fairly quiet" due to concerns about possible adverse actions. Indeed, upon this employee's return from parental leave months later, the employee discovered that her role no longer existed and that there was no work for her to do. She left the company soon thereafter. On information and belief, this employee, like Ms. Byrne, was pushed out of the company in retaliation for taking protected parental leave.

116. Finally, in terminating Ms. Byrne, Commure failed to consider Ms. Byrne for other comparable positions, as required by the Paid Family Medical Leave Act.

**COUNT ONE**
**Retaliation – Massachusetts Paid Family and Medical Leave Act**
**Mass. Gen. Laws ch. 175M, § 9, and 458 Code Mass. Regs. § 2.16**

117.    Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

118.    Plaintiff exercised her PFML rights by requesting and taking medical leave for the birth of her child.

119.    Commure interfered with Plaintiff's PFML rights by, among other things, terminating her employment because she was on leave.

120.    Plaintiff commenced the taking of job-protected leave by informing Commure of her need for leave.

121.    Commure retaliated against Plaintiff for taking leave and otherwise exercising her rights under the PFML by, among other things, depriving her of compensation, terminating her employment and failing to consider her for comparable positions.

122.    As a result of Commure's unlawful acts and practices, Plaintiff has suffered damages in an amount to be proven at trial.

**COUNT TWO**
**Sex/Pregnancy Discrimination in violation of G.L. c. 151B, § 4(1), (1E) & (11A)**

123.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

124.    During all relevant times, Plaintiff was a woman and a pregnant individual as set forth in G.L. 151B § 4(1).

125.    As a result of Plaintiff's sex and pregnancy, Commure unlawfully discriminated against her after she notified them of her pregnancy and requested pregnancy-related accommodations,

including parental leave, by, among other things, depriving her of compensation, terminating her employment, and failing to consider her for comparable positions.

126.    Commure's actions have resulted in damages to Plaintiff for which they are liable, including lost compensation, lost professional opportunities and benefits, reputational harm, emotional distress, and punitive and other damages, as well as attorneys' fees and costs, to be proven at trial.

## COUNT THREE
### Retaliation in violation of G.L. c. 151B, § 4

127.    Plaintiff repeats the allegations above as if fully set forth herein.

128.    Plaintiff engaged in protected activity by notifying Commure of her pregnancy and her need for pregnancy-related leave, and by raising concerns about the discriminatory and retaliatory treatment she faced.

129.    As a result of her engagement in protected activity, Commure retaliated against Plaintiff by, among other things, terminating her employment and failing to consider her for comparable positions.

130.    Defendant's conduct constitutes retaliation against Plaintiff in violation of M.G.L. c. 151B.

131.    Defendant's actions and omissions have caused substantial damage to Plaintiff, including lost compensation, lost professional opportunities and benefits, reputational harm, and emotional distress.

**WHEREFORE PLAINTIFF REQUESTS THAT THE COURT ORDER:**

a.    That judgment be entered for her and against Defendant;

b.    That Plaintiff be compensated for any loss of wages and/or benefits, damage to reputation and earning capacity, and other damages incurred as a result of Defendant's unlawful acts;

22

c.      That Plaintiff be awarded an amount of money that will fairly compensate her for the

emotional pain and suffering caused by Defendant's unlawful acts;

d.      That Defendant pay Plaintiff's costs and attorneys' fees resulting from this action;

e.      That Defendant be ordered to pay Plaintiff multiple, liquidated, and/or punitive damages

as permitted by applicable law;

f.      That Defendant be enjoined from unlawful retaliation; and

g.      Such relief as may be just and proper and/or that will make Plaintiff whole.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted,

Rachel Stroup (BBO #667410)
Thomas Miller (BBO #708133)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
rstroup@zalkindlaw.com
tmiller@zalkindlaw.com

May 1, 2024